901 So.2d 186 (2005)
Kevin Russell LAKIN, Appellant,
v.
Hope LAKIN, Appellee.
No. 4D04-826.
District Court of Appeal of Florida, Fourth District.
March 23, 2005.
*188 Martin L. Haines, III and Benjamin T. Hodas of Martin L. Haines, III, Chartered, Lake Park, for appellant.
Gary Brookmyer of Brookmyer, Hochman, Probst & Nadeau, P.A., Palm Beach Gardens, for appellee.
*189 GROSS, J.
Kevin Russell Lakin appeals a final judgment of dissolution of marriage, raising eight points on appeal.
We reverse the final judgment on the following five points:
1) As the wife, Hope Lakin, concedes, the trial court erred in determining that the entire value of Schwab Account # 1119 was marital. That portion of the account comprised of mutual funds was a non-marital asset. The money market portion of the account is a marital asset. As of the 2003 trial, the mutual funds portion of the account had a value of $11,645.00.
2) As the wife also concedes, the trial court erred when it equitably distributed the securities in Schwab Account # 2077. The husband inherited these assets from his mother and they remained a non-marital asset during the marriage. The husband is entitled to a credit for the securities transferred into the account in March, 2003, which had a value of $19,362.90.
Because these adjustments affect the total equitable distribution, upon remand the trial court may reconsider the distribution of other assets.
3) We affirm that part of the order requiring the husband to provide the wife "with dental and medical coverage through his employer." The husband's concern is two-fold; there is no outer limit on the obligation and he will have to locate such coverage for the wife even if the coverage becomes unavailable through the husband's employer. We cannot tell from the order if the trial court intended the obligation to provide dental and health coverage to continue, even if that coverage was no longer available from the husband's employer. In any event, the trial court erred in failing to impose any limit on the premiums the husband must pay to maintain this insurance coverage. While "there is no requirement that the trial court set a specific limit on the amount of coverage where the amount is easily ascertainable because the specific policy is already in existence," there must be a general limitation that the premiums be "reasonable." See Pauley v. Pauley, 652 So.2d 488, 489 (Fla. 4th DCA 1995); Blythe v. Blythe, 592 So.2d 353 (Fla. 4th DCA 1992). On remand the trial court shall clarify this portion of the final judgment, imposing at the very least, the limitation that the premiums for the wife's insurance coverage be reasonable.
4) As the wife further concedes, the requirement that the husband maintain life insurance coverage of $488,000 to secure his child support obligation is excessive.
The trial court ordered the husband to pay monthly child support of $1,254. The child was twenty-nine months old at the time of trial. The judgment obligated the husband to pay 187 months of child support, for a total of $234,498. This was less than fifty percent of the amount of life insurance coverage the husband was ordered to maintain. A court may not order a child support payer to maintain excessive insurance, when taking into account the total amount of the child support obligation that the insurance is designed to secure. See Walia v. Thomas, 805 So.2d 1041 (Fla. 4th DCA 2002) (noting that $1,000,000 was substantially more life insurance than necessary to secure the husband's monthly child support of $2,460 for two children, age nine and sixteen). On remand, the trial court shall reduce the required amount of coverage to reflect the amount of child support the husband owes in the future.
5) The trial court erred in determining that the husband's USAA Life Insurance Policy had a cash value of $2,389. The wife concedes that this policy had no cash value and that these funds should not have *190 been included as part of the husband's equitable distribution.
As to the remaining points raised on appeal, we affirm.

Securities in Schwab Account # 1107
The husband argues that the trial court erred in equitably distributing the securities portion of Schwab Account # 1107, valued at $185,394. He contends that this portion of the account was derived from funds he inherited from his mother, so that it is non-marital property.
The trial court did not abuse its discretion in finding that the securities portion of the account had lost its status as a non-marital asset because it had been gifted to the wife.
In July, 2001, the husband received a $161,148 check from his mother's estate and deposited it into the parties' joint checking account at Palm Beach National Bank. One week later, the husband transferred $134,000 from the joint checking account into the parties' joint Schwab Account # 5661. In September 2001, the husband deposited an additional $24,000 of funds inherited from his mother into # 5661. Between September 28 and October 12, 2001, the husband purchased investment securities in this account totaling $150,000.
Later in October, 2001, the husband transferred an A.G. Edwards account into # 5661. The A.G. Edwards account contained the wife's pre-marital securities and cash, but the account was jointly titled during the marriage. On October 30, 2001, the husband sold some of the wife's securities and placed the proceeds in the money market portion of # 5661.
In January, 2002, $24,000 in proceeds from the sale of the parties' boat, a marital asset, was placed into the money market portion of # 5661. Later, marital funds from the parties' joint Palm Beach National Bank account and funds obtained from refinancing the marital home were placed into the money market portion of # 5661. Bond proceeds and cash dividends from the husband's securities were transferred into the money market portion of # 5661 on numerous occasions. After the parties separated, the husband transferred all of the securities including the Nokia stock that had once been the wife's pre-marital asset and almost all of the cash into an account in his name only, Schwab Account # 1107.
Section 61.075, Florida Statutes (2003), controls equitable distribution of property in a divorce action. Section 61.075(5)(b)2. specifies that non-marital assets include "[a]ssets acquired separately by either party by noninterspousal gift, bequest, devise, or descent...." Section 61.075(5)(a)3. classifies interspousal gifts during the marriage as a marital asset. In evaluating assets that come to one spouse by inheritance, the task for the trial court in a dissolution proceeding is to determine whether the recipient intended that the assets remain non-marital or whether the recipient's conduct during the marriage gives rise to the presumption of a gift to the other spouse.
Obvious evidence of an intent that an inheritance remain non-marital arises where the non-marital property is placed into a separate account, no other funds are deposited into it, and the account is never intermingled with the parties' other funds. See Farrior v. Farrior, 736 So.2d 1177 (Fla.1999) (wife's inherited stock retained non-marital status when it was placed in safe deposit box and was never sold or commingled with other assets); Behrman v. Behrman, 376 So.2d 294 (Fla. 2d DCA 1979) (certificate of deposit purchased by husband after his mother's death for which funds from mother's estate were sole *191 source of purchase retained non-marital status).
Using some portion of non-marital funds to pay marital expenses does not convert the remaining non-marital funds into a marital asset. See Hamilton v. Hamilton, 758 So.2d 1213 (Fla. 4th DCA 2000) (cash that husband received from an inheritance retained its non-marital status when he placed funds into a separate account, even though he used funds from this inheritance for marital bills); Spielberger v. Spielberger, 712 So.2d 835 (Fla. 4th DCA 1998) (money deposited by husband into account prior to the marriage remained non-marital, even though it was titled in both parties' names after the marriage; this is because wife never deposited or withdrew any funds from the account, such that there was neither any actual commingling nor an inability to trace the pre-marital deposits).
However, intermingling of marital and non-marital funds in the same non-retirement account makes it difficult to assert that a portion of the account should remain non-marital. Thus, in Amato v. Amato, 596 So.2d 1243 (Fla. 4th DCA 1992), the wife deposited non-marital life insurance proceeds into an active joint checking account. The parties drew upon these funds and deposited other funds over the life of the marriage. "Such intermingling creates a presumption that [the wife] made a gift to her husband of an undivided one-half interest in the funds on deposit." Id. at 1244. The "burden of disproving the presumption is ... on the party claiming that no gift was intended." Id. at 1245.
Here, the transfer of funds from the estate into the joint banking account, the transfer into the joint Schwab account, and the subsequent activity within the Schwab account, all support the trial court's decision to treat the inherited funds as marital property. First, the husband transferred the inherited funds into the parties' pre-existing joint checking account at Palm Beach National Bank. At that time, the cash in the bank account commingled with the deposited funds. After one week, the husband transferred $134,000 from the joint checking account into the jointly titled Schwab Account, # 5661. The husband merged the jointly titled A.G. Edwards account, which contained cash and the wife's premarital securities, into # 5661. Thus, the jointly titled A.G. Edwards account commingled with both the investment and money market portions of the Schwab account.
The husband contends that the securities in # 5661 retained their non-marital character, because they were kept separate from the money market portion of the same account. However, the trial court was not required to adopt this artificial view of the evidence, which divided a single brokerage account into discrete units.
A collection of activities demonstrates that the parties treated the entirety of the Schwab account as a marital asset. Interest from bonds and dividends from the securities were transferred into the money market portion of this account. Proceeds from the sale of the marital boat, additional money inherited from the husband's mother, and funds obtained from refinancing the marital home were all deposited into the Schwab account. When marital problems surfaced, the husband transferred all the securities in the joint account into an account in his name only. Included in this transfer was the Nokia stock that had once been the wife's pre-marital property. Applying the rule of what is good for the goose is good for the gander, the trial court could properly have viewed this transfer as evidence that all securities in the account were marital property.

Permanent Alimony
We affirm the award of permanent monthly alimony of $1,200 to the wife. *192 Although this was only a six-year marriage, the trial court was within its discretion in ordering the husband to pay approximately ten percent of his net income in monthly alimony, considering the wife's health problems that limited her ability to earn beyond a minimum wage.
"Permanent periodic alimony is used to provide the needs and the necessities of life to a former spouse as they have been established during the marriage of the parties. In determining whether to award permanent periodic alimony, the court must consider the needs of the spouse requesting the alimony and the ability of the other spouse to make alimony payments." Rosecan v. Springer, 845 So.2d 927, 928 (Fla. 4th DCA 2003) (quoting Zeigler v. Zeigler, 635 So.2d 50, 53 (Fla. 1st DCA 1994)) (citations omitted).
Section 61.08(2), Florida Statutes (2003), sets forth the factors a trial court must consider when considering an alimony award. These factors consist of: (a) the standard of living established during the marriage; (b) the duration of the marriage; (c) each party's age and physical and emotional condition; (d) the financial resources of each party; (e) the time necessary for either party to acquire education or training; (f) the contribution of each party to the marriage; and (g) all sources of income available to either party. See § 61.08(2)(a)-(g); see also Mallard v. Mallard, 771 So.2d 1138, 1140 (Fla.2000).
As this court has noted, "[w]e recognize that as long as the award is `within the parameters of reasonableness,' the trial court's alimony award should not be disturbed on appeal." Bacon v. Bacon, 819 So.2d 950, 952 (Fla. 4th DCA 2002) (citations omitted). In other words, this court will not reverse an alimony award unless the trial court has abused its discretion. See Kovalchick v. Kovalchick, 841 So.2d 669, 670 (Fla. 4th DCA 2003).
The general rule is that permanent alimony is not appropriate in a short-term marriage; however, such an award may be warranted "where a genuine inequity is created by the failure to award permanent alimony." Green v. Green, 672 So.2d 49, 51 (Fla. 4th DCA 1996)[1]; Driscoll v. Driscoll, 547 So.2d 1247, 1248 (Fla. 4th DCA 1989) (reversing trial court's decision to deny permanent alimony to wife following a five-year marriage, where wife could only earn minimum wage and would be left "in a pathetic financial state"); see also Adinolfe v. Adinolfe, 718 So.2d 369, 370 (Fla. 4th DCA 1998) (noting that "six years was not such a short period as to necessarily deny permanent alimony").
The award of permanent alimony here was within the trial court's discretion. Earning over $150,000 annually, the husband has the ability to pay $1,200 a month. Significantly, the wife's health sharply limited her earning ability. The trial court found that the wife was "permanently disabled," that she suffered "from severe learning disabilities, dyslexia, attention deficit disorder, a bi-polar disorder, and ha[d] psychological and emotional issues that prevent her from being employed on a continuous basis." The wife took twelve years to obtain an Associate of Arts degree. She had never held a job for any significant period and had never earned more than minimum wage, which the trial court imputed to her as gross monthly income. Without any alimony, the wife's standard of living would have drastically *193 decreased. Even with alimony, the wife will experience a significant fall from the upper middle class lifestyle of the marriage.[2]
During the marriage, the parties agreed that the wife would remain at home with their daughter and that when the child began school, the wife would be home at the end of the school day. Post-divorce, the mother is the primary residential custodian. The child will obviously experience whatever lifestyle the mother can make for herself. The alimony award will facilitate, but not create, the type of lifestyle that the parties had contemplated for their child.
To approve the permanent alimony award in this case is consistent with those cases affirming alimony after short-term marriages. See Lagstrom v. Lagstrom, 662 So.2d 756 (Fla. 4th DCA 1995) (wife who was severely depressed is entitled to permanent alimony following five-year marriage, where record revealed she was unable to work or be self-supporting); Gallinar v. Gallinar, 763 So.2d 447 (Fla. 3d DCA 2000) (permanent alimony awarded to wife following a three-year marriage, where wife had psychiatric history that began fourteen years previously and where evidence indicated she would probably not be able to maintain gainful employment during her lifetime).
Affirmed in part, reversed in part, and remanded.
KLEIN and MAY, JJ., concur.
NOTES
[1] Green presents a scenario where permanent alimony was not warranted following a short-term six-year marriage. At the end of the marriage, the wife was thirty-six years old, in good health, had a bachelor's degree in educational psychology, had lost no career opportunities as a result of the marriage, and was receiving nearly $700,000 in equitable distribution, including $1,420 in monthly after-tax investment income.
[2] At the time of the parties' separation, they lived in a waterfront home worth over $500,000, owned a boat worth over $100,000, and took annual vacations in the United States and abroad. While the standard of living "occupies considerably less prominence" in a short-term as opposed to a long-term marriage, the trial court is nonetheless authorized to take this factor into account when making a determination of alimony. Green, 672 So.2d at 51.